CASE NO. 25-3722

# United States Court Of Appeals For The Sixth Circuit

---

*Traniece Morgan, Appellant*

*v.*

*Ohio Department of Rehabilitation and Corrections, Appellee*

---

On appeal from the United States District Court
For the Southern District of Ohio
Case No. 2:23-CV-3946

---

## MERIT BRIEF OF APPELLANT TRANIECE MORGAN

---

Mark P. Herron (Ohio Reg. No. 0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Appellant Traniece Morgan

i

## CORPORATE DISCLOSURE

Pursuant to 6th Cir. R. 26.1, Traniece Morgan makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

**NO**

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest.

**NO**

## CERTIFICATE OF SERVICE

I certify that on November 17, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record

s/Mark P. Herron

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

STATEMENT OF JURISDICTION ..............................................................1

STATEMENT OF ISSUES ............................................................................1

STATEMENT OF THE CASE ........................................................................1

SUMMARY OF THE ARGUMENT ..........................................................10

ARGUMENT ...............................................................................................11

I.    Standard Of Review.........................................................................11

II.   Ms. Morgan Has A Disability And The ODRC Was Aware Of It .................11

III.  The Department Failed To Engage In The Required Individualized Assessment Of Ms. Morgan's Condition To Determine The Extent Of Her Disability And Whether She Was Qualified To Perform The Essential Functions Of Her Position With Or Without An Accommodation.................................................................................16

CONCLUSION............................................................................................19

CERTIFICATE OF COMPLIANCE ..........................................................20

CERTIFICATE OF SERVICE .....................................................................21

ADDENDUM ..............................................................................................22

iii

# TABLE OF AUTHORITIES

**Cases**

*Cannon v. Jacobs Field Services North America*,
　　813 F.3rd 586 (5th Cir. 2016)...............................................................17

*Holiday v. City of Chattanooga*,
　　206 F.3rd 637 (6th Cir. 2000)..............................................................17

*Johnson v. DeJoy*,
　　Case No. 23-1813 (6th Cir. June 7, 2024) .........................................12

*King v. Steward Trumbull Memorial Hospital, Inc.*,
　　30 F.4th 551 (6th Cir. 2022) ...............................................................12

*Levine v. DeJoy*,
　　64 F.3rd 789 (6th Cir. 2023)...............................................................11

*McPherson v. Michigan High School Athletic Association*,
　　119 F.3d 453 (6th Cir. 1997)...............................................................11

*Root v. Decorative Paint*,
　　Case No. 23-3404 (6th Cir. Sep. 3, 2024)......................................12, 17

*Tchampka v. Ascena Retail Group, Inc.*,
　　951 F.3rd 805 (6th Cir. 2020).............................................................12

**Statutes and Regulations**

29 U.S.C. § 705 ......................................................................................12

42 U.S.C. § 12102 ............................................................................ 12-14

Ohio Admin. Code § 123:1-30-03 ......................................................9, 18

iv

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction over the within matter pursuant to 28 U.S.C. 1331 and 1343.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  Final judgment was entered by the District Court on August 7, 2025 (RE 42 and 43, Page ID # 936-948) and this appeal was timely filed on September 5, 2025 (RE 44, Page ID # 950-951).

## STATEMENT OF ISSUES

Does an employer fulfill its obligation to engage in an "individual assessment" or whether an employee has a qualifying disability and is entitled to "reasonable accommodation"  under the Rehabilitation Act of 1974 and the Americans with Disabilities Act when, after directing an employee to undergo a fitness for duty evaluation to determine whether that employee can safely perform the essential functions of their position, fails to follow the recommendation of the professional it retained to conduct the examination to obtain additional diagnostic testing to determine the extent of the impairment and the nature of accommodations required for the employee to continue to perform their essential job functions?

## STATEMENT OF THE CASE

Traniece Morgan has been employed by the Ohio Department of Rehabilitation and Corrections (the Department) in a variety of capacities for over 30 years – most recently as a Financial Associate.  She has a documented history of

1

excellent performance reviews (RE 38-1, Morgan Declaration at ¶ 2, Exhibits 1-A through 1-G, Page ID # 856-905).  Ms. Morgan also has a documented history of "mini-strokes" (transient ischemic attacks or "TIAs") of which the Department has been on ***actual*** knowledge of since at least 2014 when Ms. Morgan submitted a request for intermittent FMLA leave (RE 38-1, Morgan Declaration at ¶ 4, Exhibit 2, Page ID # 856-858, 906-910).  The Department conceded that it has been on notice of Ms. Morgan's history of TIAs since 2014 (RE 33-2, Robinson Declaration at ¶21-22, Exhibit 3, Page ID # 813, 831-833).

Ms. Morgan has stated that the effects of the TIAs over the years have had an impact on her communication abilities with others, causing her to come across as harsh and needing to have things explained to her (RE 38-1, Morgan Declaration at ¶ 5, Page ID # 856).  The Department did not present any evidence refuting the impact that this history of TIAs has had on Ms. Morgan's verbal communication abilities.  To the contrary, the Department's own documentation confirms the effect that the TIAs have had on Ms. Morgan's communication abilities.  Ms. Morgan's most recent performance review (immediately prior to the fitness for duty referral) stated in the "communication" section that Ms. Morgan "does not meet expectations" and that she needs to "find more effective means of communication with staff and co-workers" – even while noting that she performed ***all*** of her other essential job functions at or above the Department's expectations (RE 38-1, Morgan

2

Declaration at ¶ 2, Exhibit 1-G, Page ID # 856-858, 898-905). Additionally, the Department's request for approval for the fitness for duty evaluation, dated June 13, 2023 (RE 33-1, Heard Declaration, ¶ 8, Exhibit 1, Page ID # 810) specifically referenced "interactions with employees that have appeared to be intimidating and harassing in nature" and "several discussions between Ms. Morgan, her supervisor and staff members that have been considered 'unprofessional.'" The Department further cited a concern for Ms. Morgan's ability to "handle stressful situations she could face on the job" and that "she must be able to communicate effectively and professionally with her co-workers" and requested that Ms. Morgan be required to undergo "appropriate testing to determine if she is able to perform the essential functions of her job . . . without jeopardizing the health and safety of others."

Ms. Morgan was placed on administrative leave on June 7, 2023, pending completion of the fitness for duty evaluation (RE 31-1, Heard Declaration, ¶7, Page ID # 804-805). On June 13, 2023, Ms. Morgan was issued a written directive to attend the evaluation (RE 31, Robinson 30(b)(6) Transcript at 64, Exhibit 5, Page ID # 510, 627-628). As authority for conducting the evaluation, the notice specifically cited Section 123:1-30-03 of the Ohio Administrative Code, which allows the Department to "require that an employee submit to medical or psychological examinations for purposes of disability separation or a reinstatement from disability separation." The Department testified that the purpose of the evaluation was

3

regarding her communications with staff and supervisors (RE 31, Robinson 30(b)(6) Transcript at 24-25, Page ID Nos. 470-471).

On August 11, 2023, Ms. Morgan appeared before Dr. Michael Murphy, Ph.D., an "independent forensic psychological examiner and consultant" selected by the Department, for the evaluation.  In his report (RE 31, Robinson 30(b)(6) Transcript at 68, Exhibit 19, Page ID # 514, 769-777), Dr. Murphy confirmed that Ms. Morgan showed signs of having a neurological disorder that affected her communication abilities and cognitive function that required accommodation.  Dr. Murphy was very clear that additional testing was required **_before_** any final determination could be reached **_and_** that job modification might very well be required (emphasis added):

> The Shipley Institute of Living Scales-2 is a measure of cognitive functioning and cognitive impairment.  Her vocabulary, capacity got abstract/complex processing, and perceptual motor skills are significantly reduced to what would be expected with post-secondary education.  Her scores are low, low average, or below average (see Shipley).
>
> Likely impairment (AQ score) appears evidence with respect to her vocabulary skills and capacity for problem solving and abstraction.  AQ is a measure of cumulative learning experiences (i.e., educational, life, and vocational).  She is able to understand simple directions and explanations, but increasing complex verbal/written commands/ directions are likely to be problematic.
>
> Verbal and perceptual motor follow-through/responses are likely to be below average.
> Ms. Morgan has a history of multiple TIA's, sometimes referred to as mini-strokes.  She reported a mini-stroke at work but could not

reference a date.  She was hospitalized in 2017 for a stroke and hospitalized for 3 days at Grant Hospital.  She is diagnosed with hypertension, elevated cholesterol, and is overweight.  These factors increase the risk of cerebral vascular issues.

***Neuroimaging (MRI) or computed tomography (CT) scan would clarify her condition.  Also, an updated neurological consult is advisable***.

At this time, if Ms. Morgan is to return to work, modified work activity would be recommended.  Her work activity/work load most likely would need to be reduced.  Again, her cognitive functional skills fall below average and what would be expected given her work and educational history.

Her ability to handle complex problems and situations is seriously reduced.

***I recommend a neurological exam/consult for further opinion***.

In answering the two specific questions posed to him by the Department when it requested the fitness for duty evaluation, Dr. Murphy succinctly states:

**1.    Can the employee return to any occupation (physical demand levels will be included in the physician review)?**

As cited in my report *** Ms. Morgan will require modified work activity in order to return to any occupation, including her former job.  My rationale is cited *** in this report.

**2.    Is the employee fit for duty and capable of performing the essential functions of her current position without jeopardizing the health and safety of others?**

As stated, her work activity as described will require modification.  At this time, resumption of her full duties is not advised.

5

While the Department has admitted that it did not "have any issues with the manner in which Dr. Murphy conducted the fitness for duty evaluation" (RE 31, Robinson 30(b)(6) transcript at 140, Page ID # 586), it is undisputed that the Department refused to follow **_any_** of Dr. Murphy's recommendations.   The Department neither directed Ms. Morgan to under the recommended neurological consultation nor directed her to do anything to obtain further data to confirm whether she had a mild neurological disorder suspected by Dr. Murphy (RE 31, Robinson 30(b)(6) transcript at 146, Page ID # 592).  The Department made no effort to discuss any possible accommodations with Ms. Morgan – including those specifically recommended by Dr. Murphy – other than to tell her she could get her own opinion from her own doctor (at her own expense).

The Department did not present any evidence refuting any of Dr. Murphy's findings or recommendations.   Rather, when asked at deposition whether the Department "agree[d] with Dr. Murphy's findings and recommendations," the Department testified that "it's not the Department's job to agree" (RE 31, Robinson 30(b)(6) transcript at 68, Page ID # 514).  The Department conceded that Dr. Murphy recommended a neurological consult, but it admitted that it did not contact Dr. Murphy to inquire as to **_why_** he recommended the neurological consult (RE 31, Robinson 30(b)(6) transcript at 143, Page ID # 589).  While the Department also conceded that Dr. Murphy recommended that accommodation in the form of a

reduction of Ms. Morgan's work load and activity might be necessary, the Department admitted that it did not contact Dr. Murphy to discuss what he meant by modified work would be recommended or to find out what specific modifications might be necessary (RE 31, Robinson 30(b)(6) transcript at 146, Page ID # 592). Nor is there any evidence in the record that the Department discussed any possible modifications in her work load with Ms. Morgan. The Department further conceded that while Dr. Murphy found that Ms. Morgan's ability to address complex problems and situations is seriously reduced, it again admitted that it did not follow up with Dr. Murphy to obtain further information as to what he meant by that or how it that be accommodated (RE 31, Robinson 30(b)(6) transcript at 148, Page ID # 594). Even though Dr. Murphy clearly stated on multiple occasions in his report that further evaluation was needed to obtain additional information to clarify the extent of Ms. Morgan's condition and impairment, the Department actually testified that it did not interpret Dr. Murphy's report to state that he needed additional information to determine whether or not Ms. Morgan was fit for duty (RE 31, Robinson 30(b)(6) transcript at 149, Page ID No. 595). In essence – the Department "punted."

The _**sole**_ explanation offered by the Department for refusing to follow any of Dr. Murphy's recommendations was that "DRC, or the agency, does not treat the individuals" (RE 31, Robinson 30(b)(6) transcript at 142, Page ID # 588). This "justification" for disregarding Dr. Murphy's recommendations is suspect. No fair

reading of Dr. Murphy's report even remotely suggests that he was advising or directing any course of treatment for Ms. Morgan – much less that he was directing the Department to provide any treatment. Dr. Murphy was asked to determine whether Ms. Morgan was able to safely perform the essential functions of her position and he specifically stated that additional testing was necessary for such a determination to be made. While Dr. Murphy was clear that "the clinical data ***points*** to a mild neurological disorder" he was equally clear that "this requires further data for confirmation." Dr. Murphy was also clear that further testing in the form of "neuroimaging (MRI) or computed tomography (CT) scan would clarify her condition."

This is not treatment – it is testing that Dr. Murphy felt was necessary in order to answer the specific questions that the Department wanted him to answer when it originally directed Ms. Morgan to undergo the fitness for duty evaluation – the very kind of "appropriate testing" requested by the Department "to determine if [Ms. Morgan] is able to perform the essential functions of her job . . . without jeopardizing the health and safety of others" (RE 33-1, Heard Declaration at ¶ 8, Exhibit 1. Page ID # 810).

The Department also made an oblique reference to the cost of additional testing as a reason for not following Dr. Murphy's recommendations. The Department testified that the it only pays for the ***initial*** evaluation and not for any

8

follow-up evaluation – even if the medical professional conducting the initial evaluation is unable to complete the evaluation because it is out of his or her expertise or additional information is needed (RE 31, Robinson 30(b)(6) transcript at 150-151, Page ID # 596-597).  This explanation, however, is directly contrary to the State of Ohio's own policies as dictated by Ohio Admin. Code § 123:0-30-03, which expressly contemplates that more than one examination might be necessary and specifically ***requires*** the Department to pay for ***all*** necessary examinations (emphasis added):

> (A)   An appointing authority may require that an employee submit to medical or psychological examination**s** for purposes or disability separations or a reinstatement from disability separation.   The appointing authority shall select ***one or more*** licensed practitioners to conduct the examination**s**.

> (B)  Except as provided in paragraph (D) of this rule, the appointing authority pays the cost of the examination**s**.

The use of the plural in Ohio Admin. Code. § 123:1-30-03(A) and (C) is a clear indication that more than one examination might be required to reach a determination and that it is the obligation of the appointing authority to pay for those subsequent examinations if the initial examination is insufficient to reach a conclusion.  The Department's request for the fitness for duty evaluation also contemplated the possibility of more than one examination in requesting approval for "***appropriate*** testing . . . to determine if [Ms. Morgan] is able to perform the

essential functions of her job . . . without jeopardizing the health and safety of others" (RE 33-1, Heard Declaration at ¶ 8, Exhibit 1. Page ID # 810).

The net result of the Department's refusal to follow Dr. Murphy's recommendations and to comply with its own procedures as set forth in Ohio Admin. Code. § 123:1-30-03(A) and (C) is that the "appropriate testing" it ordered never got conducted. The specific questions the Department posed regarding Ms. Morgan's ability to safely perform her job duties never got answered. Based upon these facts – which are undisputed – a reasonable finder of fact can conclude that the Department discriminated against Ms. Morgan because of a disability by failing to follow Dr. Murphy's recommendation for further neurological testing of Ms. Morgan to determine the extent of her disability and appropriate accommodation.

## SUMMARY OF THE ARGUMENT

An employer violates the Rehabilitation Act and the Americans with Disabilities Act requirement to conduct an individualized assessment of an employee's actual medical condition and the impact, if any, that condition might have on the employee's specific job requirements when it directs the employee to undergo a fitness for duty evaluation and fails to follow the evaluator's recommendations for further testing and analysis that the evaluator feels is medically necessary to determine the employee's fitness for duty and possible accommodations for the condition.

10

# ARGUMENT

## I.  Standard of Review

This Court reviews the District Court's order granting summary judgment *de novo*.  See, e.g., *Levine v. DeJoy*, 64 F.3rd 789, 796 (6th Cir. 2023).

## II.  Ms. Morgan Has A Disability And The ODRC Was Aware Of It

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits a recipient of federal funding from discriminating against a qualified employee because of the employee's disability.  "[B]y statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination … [and] because the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other."  *McPherson v. Michigan High School Athletic Association*, 119 F.3d 453, 459-460 (6th Cir. 1997).  The "principal distinction between the two statutes is that coverage under the Rehabilitation Act is limited to entities receiving federal financial assistance."  *McPherson*, 119 F.3rd at 460.[1]

A *prima face* case in a claim for failure to accommodate requires the plaintiff to establish that (1) he or she has a disability, (2) he or she is qualified for their job, (3) the employer knows of the disability, (4) an accommodation was needed and (5)

---

[1]    The Department admitted that it receives federal funding (RE 20, First Amended Complaint and Jury Demand at ¶4, Page ID # 128; RE 27, Defendant's Answer to First Amended Complaint and Jury Demand at ¶4, Page ID # 168).

the employer failed to provide the accommodation.  See *Johnson v. DeJoy*, Case No. 23-1813 (6th Cir. June 7, 2024).

An employer violates the Rehabilitation Act when it fails to either accommodate an otherwise-qualified employee who has a disability or when it fails to engage in the required interactive process with that employee.  *Root v. Decorative Paint*, Case No. 23-3404 (6th Cir. Sep. 3, 2024); *Tchampka v. Ascena Retail Group, Inc.*, 951 F.3rd 805, 811 (6th Cir. 2020) ("an employer's failure to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of discrimination"); *King v. Steward Trumbull Memorial Hospital, Inc.*, 30 F.4th 551, 564 (6th Cir. 2022) ("The employer must participate in 'good faith' and conduct an 'individualized inquiry' into possible accommodations").

Under the Rehabilitation Act, an "individual with a disability" is one who has a disability as that term is defined by the Americans with Disabilities Act.  29 U.S.C. § 705(20)(B).  The Americans with Disabilities Act defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  The Americans with Disabilities Act also contains two definitions of "major life activities."  42 U.S.C. § 12102(2)(A) defines "major life activities" to include "caring for oneself, performing manual tasks, seeing, ___hearing___, eating, sleeping, walking, standing, lifting, bending, ___speaking___, breathing, ___learning___, reading, ___concentrating___, ___thinking___, ___communicating___, and

12

*working*" (emphasis added). 42 U.S.C. § 12102(2)(B) further states that a "major life activity" can also include "the operation of a major bodily function" such as "neurological [and] brain" function.

The evidence in the record establishes that Ms. Mogan has a "disability" as defined by the Rehabilitation Act and the Americans with Disabilities Act. Ms. Morgan testified to her history of TIAs in both her deposition and in her declaration (RE 38-1, Morgan Declaration, ¶ 3-5, Page ID # 856). Ms. Morgan stated in her declaration that one of the effects of her TIAs is her ability to communicate with others has become impaired in that her tone of voice can sometimes sound harsh and that she sometimes needs to have things explained to her (RE 38-1, Morgan Declaration, ¶ 5, Page ID # 856). The Department has been aware of Ms. Morgan's medical history since 2014 when it approved FMLA leave for the condition (RE 33-2, Robinson Declaration at ¶21-22, Exhibit 3, Page ID # 813, 831-833; RE 38-1, Morgan Declaration at ¶ 4, Declaration Exhibit 2, Page ID # 856-858, 906-910).

The Department offered no evidence to the contrary. In fact, its own documents *confirm* the impact that the TIAs have had on Ms. Morgan over the years. The performance evaluation for April 1, 2022, through March 31, 2023, states that Ms. Morgan "does not meet expectations" with respect to communication and that she needs to "find more effective means of communication with staff and co-workers" (RE 38-1, Morgan Declaration, Exhibit 1-G, Page ID # 902). The June 13,

13

2023, memo submitted in support of the requested fitness for duty evaluation (RE 33-1, Heard Declaration, ¶ 8, Exhibit 1, Page ID # 810) specifically references "interactions with employees that have appeared to be intimidating and harassing in nature" and "several discussions between Ms. Morgan, her supervisor and staff members that have been considered 'unprofessional.'" The Department further cited a concern for Ms. Morgan's ability to "handle stressful situations she could face on the job" and that "she must be able to communicate effectively and professionally with her co-workers." The Department specifically requested that Ms. Morgan be required to undergo "appropriate testing to determine if she is able to perform the essential functions of her job . . . without jeopardizing the health and safety of others."

Dr. Murphy's unrefuted findings support the conclusion that Ms. Morgan has a "disability" as defined by the Rehabilitation Act and the Americans with Disabilities Act. Communication, concentration, neurological and brain function are all ***specifically*** identified as major life activities, 29 U.S.C. § 12102(2)(A) and (B), and all are referenced in Dr, Murphy's report concluding that Ms. Morgan's "cognitive functioning skills fall below average" (RE 34, Robinson 30(b)(6) Transcript at 68, Exhibit 19, Page ID # 514, 369-777). The Department presented no evidence to the contrary.

14

For these reasons, the District Court's apparent conclusion that Ms. Morgan did not have a disability or require accommodation "because her TIAs are not what ODRC allegedly failed to accommodate" (RE 42, Opinion and Order at 8-9, Page ID # 943-944) was error. It is not disputed that the Department ordered the evaluation because of the ***effects*** that the history of TIAs had upon Ms. Morgan's communication abilities and her interaction with her supervisors and co-workers. Dr. Murphy ***confirmed*** that Ms. Morgan showed signs of having a neurological disorder that affected her communication abilities and cognitive function that required accommodation – the extent of which required further neurological testing to determine. Put another way, a medical occurrence such as a TIA or series of TIAs in and of itself might not constitute a disability, but the ***effects*** that a history of TIAs have on Ms. Morgan's communication ability and cognitive function does constitute a disability when it substantially impacts one or more major life activities.

The same can be said for virtually any other medical occurrence that an individual might experience. Depending on an individual's individual health history and other unique characteristics, a specific health occurrence may or may not have a prolonged or lasting impact on a major life activity to the extent that the impact becomes "substantially limiting" within the meaning of the Rehabilitation Act and the Americans with Disabilities Act but the ***effects*** of that occurrence might. In ***this*** case, Dr. Murphy's report indicates that the net effect of Ms. Morgan's TIAs did

15

substantially impact her cognitive and communication abilities, and the Department produced no evidence to the contrary.  For purposes of summary judgment, the evidence in the record is sufficient to create – at a minimum – a genuine issue of material fact as to whether Ms. Morgan has a disability under the Rehabilitation Act and the Americans with Disabilities Act.

**III.     The Department Failed To Engage In The Required Individualized Assessment Of Ms. Morgan's Condition To Determine The Extent Of Her Disability And Whether She Was Qualified To Perform The Essential Functions Of Her Position With Or Without An Accommodation**

The evidence in the record shows that Dr. Murphy found that Ms. Morgan's cognitive and functional skills were below average and recommended additional neurological testing to determine the extent of any neurological impairment and the extent of possible accommodations that would be necessary to allow her to perform her essential job functions.  Because the Department did not follow Dr. Murphy's recommendations, the underlying question that the Departmentg wanted answered – whether Ms. Morgan could perform the essential functions of her job without jeopardizing the health and safety of others – never got answered.

The circumstances of this case perfectly illustrate the importance of engaging in an ***individualized*** inquiry into the employee's unique actual medical condition in determining whether an employee is disabled under the Rehabilitation Act and the Americans with Disabilities Act and whether reasonable accommodations will be required.  "The first step ***for an employer*** in determining whether an employee with

16

a disability is qualified to perform her job is to undertake 'an ***individualized*** inquiry into the individual's ***actual medical condition***, and the impact, if any, the condition might have on that individual's ability to perform the job in question' before making a decision as to the employee's ability to perform a job."  *Root*, supra (emphasis added) (quoting *Holiday v. City of Chattanooga*, 206 F.3rd 637, 643 (6th Cir. 2000).  While this requires cooperation and participation from the employee, the employer's role is "not passive."  *Root*, supra.

Under this standard, an employer's duty to inquire does not automatically end once it receives a report.  In *Root*, supra, this Court was clear that when an employer has "been presented with evidence suggesting the need for a disability accommodation, [the employer] ha[s] a duty to inquire further."  Accord  *Cannon v. Jacobs Field Services North America*, 813 F.3rd 586, 595 (5th Cir. 2016) (the duty to engage in the interactive process and accommodate can be triggered "in a situation *** in which the employer was unquestionably aware of the disability and had received a report from its own doctor recommending accommodations").

In this case, it is submitted that the report from Dr. Murphy suggesting that accommodation may be necessary and recommending further evaluation is precisely the type of report that triggers this obligation "to inquire further."  The requirement of an individualized assessment is not satisfied when the employer fails to follow

17

the recommendations from its own medical professional recommending that it "inquire further."

The Department cannot escape its obligation to "inquire further" by alleging that Ms. Morgan never requested accommodation. The duty to engage in the required interactive process and to undertake the required "individualized assessment" is a duty that cuts both ways. The undisputed facts in this case show that it was the Department's own medical professional who – upon request from the Department – put the Department on notice that accommodation might be required and that additional neurological testing was required to determine not only the extent of Ms. Morgan's impairment but also the extent of the accommodation that might be required. The Department requested "appropriate testing" but did not provide the testing that Dr. Murphy recommended and deemed appropriate. The Department's claim that it could not do so because it only pays for one test (RE 31, Robinson 30(b)(6) transcript at 150-151, Page ID # 596-597) is directly contrary to Ohio Admin. Code § 123:0-30-03 which expressly contemplates that more than one examination might be necessary and specifically ***requires*** the Department to pay for ***all*** necessary examinations.

The purpose of the individualized assessment requirement and the interactive process is to ensure that determinations regarding the impact of an employee's disability and the necessity of accommodation for that disability are based upon all

18

relevant facts and not supposition. That purpose would be rendered virtually meaningless if employers were allowed to disregard their own experts' recommendation that specific testing – including additional specialized testing – be undertaken to determine the extent of an employee's disability.

## CONCLUSION

For the reasons set forth herein, plaintiff-appellant Traniece Morgan respectfully requests that this Honorable Court reverse the decision of the lower court and remand this case for further proceedings.

Respectfully Submitted,


s/Mark P. Herron
Mark P. Herron (Ohio Reg. No. 0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Plaintiff-Appellant
Traniece Morgan

19

# CERTIFICATE OF COMPLIANCE

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   X      this brief contains 4,419 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   ___    this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   X      this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type, or

   ___    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

(s)     Mark P. Herron_____

Attorney for:  Appellant Traniece Morgan_____

Dated:

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was served on all counsel of record through the Court's ECF system this 17th day of November, 2025.

s/Mark P. Herron
Mark P. Herron (Ohio Reg. No. 0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Appellant

21

# <u>ADDENDUM</u>

RE 20           Amended Complaint                    Page ID # 127-134

RE 42           Opinion and Order                     Page ID # 936-948

RE 43           Judgment                                 Page ID # 949

RE 44           Notice of Appeal                       Page ID # 950-951

RE 33-1        Request for Approval of Independent
                      Medical Exam (5/31/23 and 6/13/23)        Page ID # 807-810

RE 31           Dr. Murphy Report (8/11/23)             Page ID # 769-777